IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CANTU SERVICES, INC., | ) | |
| a Texas corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  CIV-12-129-R |
| | ) | |
| JAMES KEVAN WORLEY; and | ) | |
| BLACKSTONE CONSULTING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendant Blackstone Consulting, Inc.'s ("BCI") Motion for

Protective Order to Temporarily Preclude Service of Subpoena, Doc. No. 97, and Plaintiff

Cantu Services, Inc.'s ("Cantu") Motion to Compel Discovery Responses and to Overrrule

Defendant's Motion for Protective Order Regarding Subpoena.[1] Doc. No. 99. BCI filed a

response opposing Cantu's position, Doc. No. 102. Cantu filed a reply in support of its

position, Doc. No. 103, and BCI then filed a surreply in support of its position. Doc. No.

108. The Court held a hearing over the dispute on May 18, 2021, Doc. No. 109, and now

finds as follows.[2]

---

[1] Under Fed. R. Civ. P. 37(a)(1), a motion to compel must include "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." However, the Court may waive strict compliance with the conference requirements if the Court deems it necessary. *See Case v. Unified School Dist. # 233,* No. Civ.A. 94–2100–GTV, 1995 WL 340988, at *2 (D. Kan. June 1, 1995). Here, strict compliance is not necessary in light of the parties' discussions with the Court in its January 6, 2021 Scheduling Conference. Doc. No. 87, p. 13 ("[T]he parties anticipate that the Court will need to resolve a [discovery] dispute … after briefing by the parties.").

[2] BCI's motion for a protective order, Doc. No. 97, seeks an order prohibiting Cantu from serving a subpoena duces tecum on nonparty Robert Brown because it contends that Cantu seeks to discover communications involving BCI

This discovery dispute follows a long line of litigation arising from a food service contract at the U.S. Army post in Fort Sill, Oklahoma. Under the Randolph Sheppard Act, 20 U.S.C. § 107, the United States Government provides priority to blind persons when evaluating bids for the provision of food services on federal property. Between 1999 and 2013, the state licensing agency chose Mr. A.B. Swanson ("Swanson") to serve as the blind licensed manager on the Fort Sill Contract. Doc. No. 84, ¶ 5. Swanson then selected Cantu to serve as his teaming partner, and the partnership—governed by a Manager Support Agreement ("MSA")—lasted from 1999 through September 30, 2013. Doc. No. 99, p. 5.

The partnership, though lasting over a decade, had its flaws. In 2011, Cantu filed suit for breach of contract against Swanson in Comanche County, Oklahoma, alleging that Swanson sought to terminate Cantu and replace it with BCI.[3] Doc. No. 99, p. 7. Before the suit's conclusion, Swanson agreed to retire on October 1, 2013—the expiration date of the MSA with Cantu. Doc. No. 84, ¶ 14. Meanwhile, the State selected Robert Brown ("Brown") to serve as its new licensed manager if the contract at Fort Sill was renewed. Doc. No. 102-2, p. 7. In turn, Brown "entered into a Vend[o]r Support Agreement ["VSA"] with BCI to … serve as Brown's teaming partner if the State was awarded the contract." Doc. No. 99, p. 6. Thus, Brown and BCI planned to become partners if a new contract was implemented.

---

that are privileged. In response, Cantu sought an order compelling discovery responses from BCI and overruling BCI's objection to the non-party subpoena duces tecum. Doc. No. 99.

[3] *Cantu Services, Inc. v. A. B. Swanson et al.*, CJ-2011-440.

Seeking to "protect its contractual rights and proprietary information," Cantu filed suit against the State on January 28, 2013 (the "Oklahoma County Action").[4] *Id.* p. 7. Brown and BCI, both represented by attorney Leif Swedlow ("Swedlow"), intervened in the action. Doc. No. 84, ¶ 21; Doc. No. 102-6, ¶¶ 2-3. Swedlow stated that, at the time, he "confirm[ed] consent from both BCI and [ ] Brown" to represent both parties. *Id.*

In April or May of 2013, Brown arrived at Fort Sill to become acquainted with the work environment as Swanson's retirement date—October 1, 2013—neared. Doc. No. 102-2, p. 13. However, on May 7, 2013, the Department of the Army extended the pre-existing Fort Sill Contract for 365 days through a "Task Order," creating the possibility for Cantu to remain on the Fort Sill Contract for an additional year. Doc. No. 99, p. 6. Two months later, on July 16, 2013, Cantu's Oklahoma County Action was "transferred to Comanche County and consolidated with the Comanche County Action." Doc. No. 99, pp. 7-8.

As a result, Cantu sought a judicial declaration from the District Court of Comanche County that the May 7th Task Order entitled it to remain on the Fort Sill Contract on and after October 1, 2013. Doc. No. 84, ¶ 22. Brown and BCI opposed Cantu's request because Brown—chosen to replace Swanson due to his retirement—had executed the VSA with BCI. Doc. No. 99, p. 2.

On September 20, 2019, BCI President Joe Blackstone emailed Attorney Leif Swedlow stating that "[u]nder no circumstances can we allow/force Brown … to have to

---

[4] *Cantu Services, Inc. v. State of Oklahoma ex rel. ODRS*, CJ-2013-588.

work with Cantu after 9/30/13." Doc. No. 104, p. 24 (filed under seal). On September 24, 2013, Swedlow, Brown, and BCI communicated via email regarding an "expiration or termination notice" and "Final Termination notice." Doc. No. 103-2, p. 2. On September 26, 2013, Judge Aycock, presiding over the consolidated action, issued an order ("the Aycock Order") affirming that the May 7th Task Order maintained Cantu's status as the teaming partner on the Fort Sill Contract after October 1, 2013. Doc. No. 84-1. The Aycock Order held:

> Cantu Services, Inc. shall retain all rights and responsibilities to continue as the teaming partner for the blind vendor/manager ... and ... [t]hose rights and responsibilities shall continue on and after October 1, 2013 and so long as a Task Order is [in] effect, unless otherwise terminated….
>
> [and]
>
> [T]he result of [the Court's] findings and conclusions today will be that effective Oct 1, 2013, the new manager under the food service Task Order may be Robert Brown and that *the teaming partner will be Cantu Services, Inc*.

Doc. No. 84-1, ¶¶ 4, 10 (emphasis added). Despite the Aycock Order stating that "the teaming partner will be Cantu Services, Inc.[,]" Swedlow drafted a termination letter for Brown to send to Cantu. Doc. No. 102, p. 25. Further, Brown stated that he felt pressure from BCI to terminate Cantu because BCI informed him that the order was likely "unenforceable" and reminded him of his agreement with BCI. Doc. No. 104, pp. 12–13.

On September 27, 2013, Brown mailed a termination letter to Cantu, stating that "the last day [Cantu] will provide services … is September 30, 2013." Doc. No. 99-4. On October 1, 2013, Brown took over as the licensed manager at Fort Sill, utilizing BCI as his teaming partner, which continued until August 1, 2017. Doc. No. 84, ¶ 36. One month after

BCI and Brown began work at Fort Sill, Judge Aycock issued a second order clarifying that

> [i]t was the court's intent and purpose to maintain the status quo of the parties as existed under the contracts on May 7, 2013 when the Task Order was issued. The Court sought to prohibit any party or other entity from interfering with the contractual relationships as then existed.

Doc. No. 84-4, ¶ 1. Pursuant to the Fort Sill Contract's mandatory arbitration provision, Cantu "initiated arbitration immediately." Doc. No. 84, ¶ 37. Cantu eventually received an arbitration award in excess of $4 million against Brown because the panel found Cantu would have received that amount had it served as his teaming partner on and after October 1, 2013. *Id.* ¶ 38. United States District Judge Charles Goodwin confirmed the arbitration award on January 14, 2020. Doc. No. 84-5.

Seeking to recover the same damages from BCI, Cantu amended its Complaint in this action and filed a claim for tortious interference against BCI. Doc. No. 84. Pursuant to Fed. R. Civ. P. 45(a)(4), Cantu provided BCI with a notice of its intention to subpoena Brown, and then filed its notice of subpoena duces tecum to Brown. Doc. Nos. 93, 94. In response, BCI filed a motion for a protective order. Doc. No. 97. Cantu then filed this motion to compel, attempting to discover communications made between and among Swedlow, Brown, and BCI from 2013 through 2015. Doc. No. 99. BCI opposed the motion, arguing that the communications sought by Cantu in Cantu's discovery requests to BCI and its subpoena to Brown are protected by either the attorney-client privilege or the work product doctrine. Doc. No. 102. Cantu responds with two alternative arguments.

First, Cantu argues that BCI and Brown were concurrently represented by Swedlow, but not jointly represented, and that at a minimum, the parties could not have been "jointly represented" by Swedlow after the issuance of the Aycock Order on September 26, 2013. Doc. No. 99, pp. 14-19. Second, Cantu argues that even if joint representation existed, the crime-fraud exception warrants discovery of all the requested communications or at least an *in camera* review of the documents sought. *Id.* pp. 20-28.

The discovery requests in dispute include 11 document requests in a subpoena Cantu wishes to serve on Brown,[5] six interrogatories and requests for production,[6] and eight requests for admission.[7] At issue in this motion to compel are Interrogatory Nos. 11–16 and Requests for Production Nos. 6–11, which request:

> **Interrogatory No. 11 and Request for Production No. 6:** All communications between BCI officers, employees, and representatives[8] and Brown between May 1, 2013 and October 31, 2015 relating to the state court actions, the arbitration, the Aycock Order, and Cantu's termination. Doc. No. 97-1, p. 11–12; Doc. No. 102-3, p. 14.

> **Interrogatory No. 12 and Request for Production No. 7:** All communications between BCI officers, employees, and representatives and Swedlow between May 1, 2013 and October 31, 2015 relating to the state court actions, the arbitration, the

---

[5] Doc. No. 94-1, pp. 8-11. BCI's motion for a protective order, Doc. No. 97, seeks to temporarily preclude service of Cantu's subpoena duces tecum on Robert Brown pending the resolution of this motion to compel. Doc. No. 99; *see also* p. 1, n. 1 of this Order. In light of the Court's decision to conduct *in camera* review, BCI's motion is subject to denial pending the Court's review of the documents produced by Brown, assuming Brown does not assert his own objections to the subpoena duces tecum based on any relevant privilege. Thus, Cantu may serve the subpoena duces tecum on Brown, and should Brown elect not to object, he must then produce the documents requested to the Court for *in camera* review.

[6] Doc. No. 102-3, pp. 10-17.

[7] Doc. No. 102-4. As BCI notes in its response, "BCI already provided substantive responses to all of these Requests, including admissions or denials of Cantu's Requests for Admission Nos. 1–8." Doc. No. 102, pp. 11–12 (citing Doc. No. 102-4). In Cantu's reply brief, it did not provide a substantive response to BCI's argument. Further, it appears from the Court's cursory review that BCI's responses were sufficient, and thus, the Court need not compel BCI to provide additional answers to Cantu's requests for admission.

[8] BCI officers, employees and representatives include, but are not limited to, Joe Blackstone, Jim Brown, Bruce Marquardt, and Rosalia Ibarrola. Doc. No. 97-1, p. 10.

Aycock Order, and Cantu's termination. Doc. No. 97-1, pp. 10–11; Doc. No. 102-3, pp. 14–15.

**Interrogatory No. 13 and Request for Production No. 8:** All communications between Brown and Swedlow and other firm attorneys or employees between May 1, 2013 and October 31, 2015 relating to the state court actions, the arbitration, and the Aycock Order. Doc. No. 97-1, pp. 11–12; Doc. No. 102-3, pp. 15–16.

**Interrogatory No. 14 and Request for Production No. 9:** All communications between Brown, BCI, and Swedlow and other firm attorneys or employees between May 1, 2013 and October 31, 2015 relating to the state court actions, the arbitration, the Aycock Order, and Cantu's termination. Doc. No. 97-1, p. 12; Doc. No. 102-3, pp. 16–17.

**Interrogatory No. 15 and Request for Production No. 10:** All documents relating to or comprising legal bills from Swedlow between May 1, 2013 and October 31, 2015 relating to the state court actions, the arbitration, and the federal court action confirming the arbitration award. Doc. No. 97-1, pp. 12–13; Doc. No. 102-3, pp. 16–17.

**Interrogatory No. 16 and Request for Production No. 11:** All documents relating to the termination of Cantu as Brown's teaming partner at Fort Sill. Doc. No. 97-1, p. 13; Doc. No. 102-3, p. 17.

To begin with, Cantu argues that from May 1, 2013 to October 31, 2015, Brown and BCI were *concurrently* represented, but not *jointly* represented. Doc. No. 99, pp. 16–17. Specifically, Cantu states that though the parties had a common commercial interest—"to operate as teaming partners"—their legal interests were different. *Id.* p. 13. In response, BCI asserts that it entered a joint client relationship with Brown when both retained Swedlow and intervened in the consolidated action between Cantu and Swanson. Doc. No. 102, p. 17. As support, BCI offers Swedlow's affidavit stating that he "confirmed that BCI and Brown both understood the implication of both of them agreeing to engage [him] as their attorney for matters *in which they had a mutual interest*." Doc. No. 102-6, ¶ 4 (emphasis added). Alternatively, Cantu argues that after the Aycock Order, BCI and

Brown's interests were no longer mutual, and thus, their joint representation ended. Doc. No. 99, p. 14.

A client typically waives the attorney-client privilege if he or she discloses otherwise privileged information to a third party. *United States v. Ary*, 518 F.3d 775, 782 (10th Cir. 2008). However, an exception to the waiver of privilege arises if the disclosure is made to a co-client and the clients agreed to share information pursuant to their common interest. *See, e.g.*, *Selby v. O'Dea*, 90 N.E.3d 1144, 1147 (Ill. App. Ct. 2017) (citing Okla. Stat. tit. 12 § 2502(B) as an example of a statutory common interest exception to the waiver rule). Accordingly, the joint representation or co-client doctrine applies "[w]hen the same attorney simultaneously represents two or more clients on the same matter." Paul R. Rice, Attorney-Client Privilege in the United States § 4:30 (2011). The Restatement (Third) of the Law Governing Lawyers explains that joint representation is permissible unless there is a "substantial risk that the lawyer's representation of one client would materially and adversely affect" the lawyer's duty to another client. *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 50 (Tex. 2012) (citing 2 Restatement (Third) of the Law Governing Lawyers § 128 (2000)).

Under the Restatement's conflict rules, an attorney should end the joint representation when the attorney sees the two co-clients' interests diverging. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 368 (3d Cir. 2007), *as amended* (Oct. 12, 2007) (citing Restatement (Third) of the Law Governing Lawyers § 121 cmts. e(1)-(2)); *see also F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 463 ("A joint attorney-client relationship remains intact until it is expressly terminated or until circumstances arise that readily imply *to all*

*the joint clients* that the relationship is over."). However, when an attorney fails to end joint representation despite a conflict, the widely accepted principle is that the clients retain the privilege notwithstanding the conflict. *Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 937–38 (D.C. Cir. 1984) (*per curiam*). In *Eureka,* the D.C. Circuit explained that "counsel's failure to avoid a conflict of interest should not deprive the client of the privilege." *Id.* at 938. This principle is consistent with the policy of the co-client privilege—"to encourage openness and cooperation between joint clients." *Id.* at 937.

Here, the parties clearly intended to enter into a joint client relationship from the outset. Beginning in March 2013, Brown and BCI jointly consulted Swedlow for legal advice. Doc. No. 99, p. 21. Consistent with *Eureka*, even if Swedlow should have ended the joint representation after the Aycock Order, BCI and Brown retained the attorney-client privilege for their joint representation. *See e.g.*, 743 F.2d at 938. Though the parties' interests may have diverged, Cantu offers no evidence that BCI and Brown, as co-clients, believed their joint representation ended. Thus, it appears to the Court that the privilege likely remained intact after the Aycock Order. Accordingly, the Court turns to the issue of whether the documents sought were privileged or whether an exception applies.

In the Tenth Circuit, "[i]n camera review is an appropriate method of determining whether documents are privileged." *Williams v. Broaddus,* 331 F. App'x 560, 562 (10th Cir. 2009); *FDIC v. United Pacific Ins. Co*., 152 F.3d 1266, 1276 n.6 (10th Cir. 1998) ("In determining whether the relevant ... records contain privileged communications, the district court may adopt procedures, such as *in camera* review of allegedly privileged documents, to protect against disclosure of privileged communications."). However, to warrant *in*

*camera* inspection, "[t]he court must have some [...] grounds for conducting an *in camera* review." *Mounger v. The Goodyear Tire & Rubber Co.*, No. 99-2230-JWL, 2000 WL 33712198 at *1 (D. Kan. Sept. 22, 2000) (emphasis added) (citing *Mason C. Day Excavating, Inc. v. Lumbermens Mut. Cas. Co.,* 143 F.R.D. 601, 604 (M.D.N.C. 1992)). Ultimately, "[t]he decision to review documents *in camera* is within the discretion of the trial court." *In re Stewart*, No. 15-12215-JDL, 2021 WL 1157928, at *4 (Bankr. W.D. Okla. Mar. 25, 2021) (citing *In re Grand Jury Subpoenas,* 906 F.2d 1485, 1493 (10th Cir. 1990)).

Cantu argues that *in camera* review is warranted to determine whether the crime-fraud exception to the attorney-client privilege applies. The Tenth Circuit has explained that

> [t]o invoke the crime-fraud exception, the party opposing the privilege must present prima facie evidence that the allegation of attorney participation in the crime or fraud has some foundation in fact. The evidence must show that the client was engaged in or was planning the criminal or fraudulent conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it. The exception does not apply if the assistance is sought only to disclose past wrongdoing, but it does apply if the assistance was used to cover up and perpetuate the crime or fraud.

*In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) (internal citations omitted). Accordingly, Cantu must present evidence sufficient to support a reasonable belief that *in camera* review will yield evidence that the documents and communications requested from May 1, 2013 to October 31, 2015 involved fraud or covering up fraud. As the Tenth Circuit has previously stated, "some type of prima facie showing of a crime or fraud is required under Oklahoma law in order to trigger the applicability of the crime-

fraud exception." *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995) (citing *White v. American Airlines, Inc.,* 915 F.2d 1414, 1424 (10th Cir. 1990)).

Cantu argues that an email from Joe Blackstone to Swedlow on September 20, 2013—stating that "under no circumstances can we allow/force Brown […] to have to work with Cantu …"—reveals that BCI at a minimum contemplated inducing Brown to terminate Cantu. Doc. No. 104, p. 24. Next, Cantu alleges that because BCI's privilege log includes communications between Swedlow and BCI on September 24, 2013 regarding *Brown's* termination of Cantu, BCI had already implemented a back-up plan for terminating Cantu, through Brown, if Judge Aycock ruled in Cantu's favor. Doc. No. 103, p. 3 ¶ 5 (emphasis added).  Further, Cantu argues that the September 27, 2013 termination letter, drafted by Swedlow and sent to it by Brown, contains misrepresentations. Doc. No. 103, p. 3 ¶ 9. For example, Cantu reasons that the letter invokes the MSA's provisions for breach, but Brown did not become a party to the MSA until October 1, 2013. *Id.*

Lastly, Brown stated that BCI acknowledged it knew about the Aycock Order, but believed it was unenforceable. Doc. No. 104, p. 3 ¶ 10. BCI also reminded Brown of his obligations under the VSA with BCI. *Id.* p. 21. Conversely, BCI argues that under the appropriate, narrow view of the crime-fraud exception, Cantu has not provided evidence of any crime or fraud. Further, BCI argues that the factors counsel against *in camera* review, specifically because analyzing over 200 documents would be too burdensome on the Court's resources. Doc. No. 108, p. 6.

The Court finds that Cantu has met its burden of showing sufficient evidence to warrant *in camera* review of the allegedly privileged communications. The "'fraud'

exception has been interpreted broadly," including, for example, "confederating with clients to allow court and [opposing] counsel to labor under a misapprehension as to the true state of affairs." *In re Stewart*, No. 15-12215-JDL, 2021 WL 1157928, at *6 (Bankr. W.D. Okla. Mar. 25, 2021) (citing *Fellerman v. Bradley*, 493 A.2d 1239, 1245 (N. J. 1985)). Generally, fraud connotes deception or trickery. *See* 1 J. Story, Commentaries on Equity Jurisprudence § 189, p. 221 (6th ed. 1853). District Courts have found showings of deception, or potential deception, sufficient to support taking on *in camera* review. *See, e.g.*, *Gates Corp. v. CRP Indus., Inc.*, No. 1:16-CV-01145-KLM, 2018 WL 4697327, at *17 (D. Colo. Aug. 10, 2018), *objections overruled*, 2019 WL 2183408 (D. Colo. May 21, 2019); *United States v. Matthews*, No. 10-CR-0002-CVE, 2010 WL 1542427, at *1 (N.D. Okla. Apr. 14, 2010) ("If a defendant makes a plausible showing that the file will produce material evidence, *in camera* review of the file is appropriate.") (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 58 n. 15 (1987)); *Burton v. R.J. Reynolds Tobacco Co.*, 167 F.R.D. 134, 143 (D. Kan. 1996) (finding it "necessary to conduct *in camera* review" to determine whether defendants knew "nicotine was addictive and failed to disclose that information").

Here, Cantu provided evidence that, at a minimum, a reasonable person could have a good faith belief that *in camera* review will reveal communications indicating that Swedlow and/or BCI deceived Brown when advising him to terminate Cantu. First, in a voluntary statement, Brown affirmed that despite the Aycock Order, a BCI representative pressured him to abide by his contract with BCI. Doc. No. 104, p. 13. Second, prior to the Aycock Order, BCI had already informed Swedlow that "under no circumstances" should Brown and Cantu work together beginning October 1, 2013. Doc. No. 103, p. 2 ¶ 3. Taken

12

together, the facts presented by Cantu reveal an opportunity and motive to deceive Brown into believing his only option was to terminate Cantu. Accordingly, the Court finds that *in camera* review is justified for the requested documentation from May 1, 2013 through October 31, 2015.

For the reasons set forth above, Cantu's motion to compel, Doc. No. 99, is DENIED IN PART and GRANTED IN PART. The Court finds that Brown and BCI were jointly represented, discussed above. However, the Court concludes that *in camera* review is necessary to determine whether the crime-fraud exception applies to BCI's assertion of the attorney-client privilege. Thus, BCI must produce the discovery requests at issue— Interrogatory Nos. 11–16 and Requests for Production Nos. 6–11—to the Court for *in camera* review **by June 15, 2021**.

Further, BCI's motion for a protective order, Doc. No. 97, is DENIED IN PART. Because the Court finds *in camera* review necessary, Cantu is permitted to serve its subpoena duces tecum on Robert Brown. Brown may then object to the subpoena duces tecum on any applicable grounds if he chooses **within fourteen days after service of the subpoena**. Fed. R. Civ. P. 45(d)(2)(B). Should Brown elect not to object, or should the Court overrule his objection, he must then produce the requested documents—Document Requests Nos. 1–11 (Doc. No. 94-1)—to the Court for *in camera* review to determine whether BCI's asserted privilege is valid. If Brown chooses to object, the Court will address the issue and set new deadlines accordingly. In the event Brown elects not to object, he must submit the requested documents to the Court **by June 25, 2021.**

13

**IT IS SO ORDERED** on this 7th day of June 2021.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE